UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X
                                              06 Civ. 1223 (WCC)
GINA AMOROSANO-LEPORE,                    :
                                              ECF CASE
                    Plaintiff,            :

          - against -                     :        **OPINION**
                                              **<u>AND ORDER</u>**
JAMES GENEROSO, individually, VICTORIA    :
L. KANE, individually, BARBARA COLEMAN,
individually, MATTHEW IAROCCI,            :
individually, and the CITY OF NEW
ROCHELLE, New York,                       :

                    Defendants.           :

- - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                              LOVETT & GOULD
                              **Attorneys for Plaintiff**
                              222 Bloomingdale Road - Suite 305
                              White Plains, New York 10605

DRITA NICAJ, ESQ.

          Of Counsel


                              ANDREW M. CUOMO
                              ATTORNEY GENERAL FOR THE STATE OF
                                NEW YORK
                              **Attorneys for Defendants
                                James Generoso, Victoria L. Kane
                                and Barbara Coleman**
                              120 Broadway
                              New York, New York 10271

ANTHONY J. TOMARI, ESQ.
  Ass't Attorney General

          Of Counsel

**Copies E-Mailed to Counsel of Record**

**A P P E A R A N C E S :** **(continued)**

WILSON, ELSER, MOSKOWITZ, EDELMAN
  & DICKER LLP
**Attorneys for Defendants**
  **Matthew Iarocci and City of New**
  **Rochelle**
3 Gannett Drive
White Plains, New York 10604

PETER A. MEISELS, ESQ.
LALIT K. LOOMBA, ESQ.

    Of Counsel

**Conner, Sr. D.J.:**

Plaintiff, Gina Amorosano-Lepore brings this action against defendants James Generoso ("Generoso"), Victoria L. Kane ("Kane"), Barbara Coleman ("Coleman") (collectively "State defendants"), Matthew Iarocci ("Iarocci") and the City of New Rochelle (the "City") (collectively "City defendants") pursuant to 42 U.S.C. § 1983. She alleges that defendants violated her First and Fourteenth Amendment rights when they preferred disciplinary charges against her resulting in her termination as employee of the New Rochelle City Court (the "City court"). All defendants moved for summary judgment on various grounds. For the following reasons, defendants' motions are granted in part and denied in part.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed. Plaintiff was employed as a clerk of the City court from February 5, 1996 to August 4, 2006; she was interviewed and recommended for hire by Generoso. (State Defs. R. 56.1 Stmt. ¶¶ 1, 7; City Defs. R. 56.1 Stmt. ¶ 15.) At all relevant times, Generoso, Kane and Coleman were employed by the State. (State Defs. R. 56.1 Stmt. ¶¶ 2-4.) Generoso was the Chief Clerk of the court, Kane was the Deputy Chief Clerk and Coleman was the judges' secretary. (*Id.*) Iarocci was employed by the City as Personnel Director for the City. (*Id.* ¶ 5.) As Chief Clerk, Generoso was responsible for managing approximately twenty to thirty employees, interviewing and hiring clerical staff for the City court and determining whether to prefer disciplinary charges against court employees of both the City and

the State. (*Id.* ¶ 6).[1]

Since April 1977, operations of the City court have been financed by the State and the court employees became employees of the State, although, a small number of the staff are employed by the City. (City Defs. R. 56.1 Stmt. ¶¶ 7-8.) During her employment at the City court, plaintiff became a member of the Civil Service Employees Association ("CSEA"), a labor union. (*Id.* ¶ 21.) Effective January 1, 2001, plaintiff's position was reclassified from clerk to Customer Service Representative. (*Id.* ¶ 17.)

Sometime during the week of March 29, 2004, Generoso and Judge Preston Scher interviewed plaintiff for a potential promotion. (*Id.* ¶ 28.) Generoso felt plaintiff's "temperament and demeanor were not appropriate for the new position" and she did not get the promotion. (State Defs. R. 56.1 Stmt. ¶ 10 (citing Generoso Decl. ¶ 7).) That weekend, Coleman received several telephone calls at home from plaintiff. (*Id.* ¶ 11.) In those calls, plaintiff stated how angry and annoyed she was about not getting the promotion, and stated "if she had a gun, she would kill everyone in the office." (*Id.*) Plaintiff also giggled and said she was just kidding. (Pl. R. 56.1 Stmt. ¶ 11.) Coleman relayed this to Kane who asked her to inform police Lieutenant Jackson, which Coleman did on that Monday morning. (State Defs. R. 56.1 Stmt. ¶ 12.) Kane then told Generoso. (*Id.*) Beginning on Monday April 5, 2004 plaintiff was required to go through a magnetometer for approximately one week; she had never been required to do so previously. (Pl. R. 56.1 Stmt. ¶ 90.)

On Monday April 5, 2004, plaintiff called Iarocci and asked to meet with him to discuss a problem she had relating to her job. (City Defs. R. 56.1 Stmt. ¶ 31; Iarocci Aff. ¶ 23.) Plaintiff and

---

[1] Plaintiff disagrees that Generoso is responsible for decisions about City employees, and states that, according to Tomme Berg ("Berg"), the district executive for the Ninth Judicial District, City employees are the responsibility of the City. (Pl. R. 56.1 Stmt. ¶ 6.)

her husband met with Iarocci, and plaintiff told Iarocci she was unhappy that she did not receive the promotion, and that she believed she was treated unfairly in her interview with Generoso and Judge Scher. (City Defs. R. 56.1 Stmt. ¶¶ 32-33.) Iarocci states that he told plaintiff he would try to schedule a meeting to discuss her concerns. (*Id.* ¶ 35.) According to plaintiff and her husband, at this meeting plaintiff also expressed concerns that employees at the court falsified documents and padded tickets, that Generoso received gifts for dismissing or reducing tickets and violations, that Coleman stole approximately $3,500, that Generoso's aunt who was also a court employee repeatedly curses and refers to people as niggers and that the City Marshal was running a private law office from the City on City time. (Pl. R. 56.1 Stmt. ¶¶ 33, 92-97; Nicaj Aff'm, Ex. 26 at 26-27.) Plaintiff felt that her relationship with Generoso deteriorated after this meeting. (Pl. R. 56.1 Stmt. ¶¶ 33, 102.) Generoso recalled that Iarocci told him he met with plaintiff and her husband but he did not recall the content of the meeting or whether Iarocci told him what was said. (Nicaj Aff'm, Ex. 21 at 113.)

Plaintiff and her husband also met with City Mayor Timothy Idoni ("Idoni") in May 2004. (Pl. R. 56.1 Stmt. 105.) They state that plaintiff told Idoni of the corruption in the Clerk's office, the falsification of records at the City court, that the City Marshal was performing private work during court hours and that the City court was operating in a dysfunctional manner. (*Id.*; Nicaj Aff'm, Ex. 26 at 77.) She states that Idoni told her "his hands were tied" and he would speak to Iarocci and Generoso. (Pl. R. 56.1 Stmt. ¶¶ 105, 107.)

On July 9, 2004, a meeting was held among plaintiff, Iarocci, Generoso, Kane and plaintiff's union representative, Carl Hochberger ("Hochberger"), to discuss plaintiff's concerns over the decision not to promote her. (City Defs. R. 56.1 Stmt. ¶¶ 36-37.) Plaintiff stated that she was

unhappy at the court, complained that coworkers screamed at her and each other and claimed that Generoso was a liar and took the word of liars concerning her; she was also angry for having been forced to go through the court magnetometers for a period of time following the decision not to promote her. (*Id*. ¶ 38.) Hochberger suggested that plaintiff take a few days off and consider consulting with members of the Employee Assistance Program. (*Id*. ¶ 39.)

According to plaintiff, Iarocci stated that she should make a "fresh start" and mentioned resignation. (Pl. R. 56.1 Stmt. ¶¶ 36, 110.) According to Iarocci, he told plaintiff that resignation was one possibility if her job was too onerous, but that another possibility he hoped she would avail herself of was to do a good job and pursue opportunities for promotion. (City Defs. Reply Mem. Supp. Mot. Summ. J. at 3 (quoting Loomba Aff., Ex. U at 90).) Plaintiff also states that at this meeting she again expressed her concerns that employees were padding tickets and requested that Iarocci transfer her to a different department. (Pl. R. 56.1 Stmt. ¶¶ 38, 109.) Iarocci told her they would not consider transfer because they would not transfer an employee who is having problems in one department to another department. (Nicaj Aff'm, Ex. 24 at 104.)

On March 3, 2005 plaintiff sent a letter to Judge Nicolai, Administrative Judge for the Ninth Judicial District, requesting a meeting to discuss the difficulties she was having working for Generoso and plaintiff's belief that she was singled out and treated differently than other employees. (Pl. R. 56.1 Stmt. ¶ 111.) In March 2005 plaintiff and her husband met with Berg, and they state that plaintiff communicated to Berg concerns similar to those she had expressed to Iarocci and Idoni; she informed Berg that Generoso accepted gifts in exchange for fixing tickets and appointed individuals who failed civil service tests, that City employees were assigned State functions and State employees assigned City functions, that Generoso and Kane were repeatedly tardy, creating problems in the

4

workplace, that employees were required to pay for shortages in their registers from their own funds, that the City Marshal was running a private law practice from the City court and that parking tickets were improperly dismissed and/or reduced. (*Id*. ¶¶ 112-15; Nicaj Aff'm, Ex. 26 at 55.) Berg states that plaintiff conveyed her unhappiness with her job, her feeling that she was not being treated well, a specific issue about a cash shortage and some "vague and undetailed allegations about how the court was being run." (Nicaj Aff'm, Ex. 25 at 8-9.) Following this meeting, Berg contacted Generoso because she wanted to meet with him to discuss the procedures about shortages and overages in the registers. (*Id*. at 23.)

There was a meeting on March 16, 2005 with Generoso, Kane, Berg, Rita Leone ("Leone") from Berg's office, Judge Scher and Iarocci. (Pl. R. 56.1 Stmt. ¶ 118.) Plaintiff states that she was directed to join the meeting just before it ended and that Generoso and Iarocci pressured her to resign. (*Id*.) She also states that she expressed concern at the meeting that defendants were lying about her. (*Id*. ¶ 119.) Generoso states that the purpose of the meeting with Kane, Berg, Leone, Iarocci and Judge Scher was for Berg and Leone to instruct the City court on procedures for handling register shortages. (Nicaj Aff'm, Ex. 21 at 148-49.) Plaintiff did not join the meeting until the end. (*Id*.)

Plaintiff wrote letters to Hochberger on April 5 and 6, 2005 about her time sheet being altered and about feeling "hurt" when Generoso told her in a meeting with other employees that she had "short term memory." (Pl. R. 56.1 Stmt. ¶¶ 120-21; Nicaj Aff'm, Exs. 15 & 16.) Another meeting was held on April 18, 2005 between Iarocci, Iarocci's assistant Valeri Martin, plaintiff, Hochberger and CSEA President John Caldararo. (City Defs. R. 56.1 Stmt. ¶ 40.) At this meeting, plaintiff complained that her time sheet for February 23, 2005 had been improperly erased, that she was asked

to provide a doctor's note to explain the sick leave she took on February 24 and 25, 2005 and that City employees were tracking their time on forms created for State employees. (*Id*. ¶ 41.) Following this meeting, Iarocci suggested to Generoso that the time sheet issue did not deserve further attention because plaintiff had not lost any leave time, that Generoso should drop the request for a doctor's note and that City time forms should be used for City employees. (*Id*. ¶ 42.)

Sometime prior to April 26, 2007, Coleman, Kane and other staff members witnessed an incident between plaintiff and another employee. (State Defs. R. 56.1 Stmt. ¶ 13; City Defs. R. 56.1 Stmt. ¶¶ 43-45.) Plaintiff was arguing with this employee because plaintiff wanted her to count the deposit money faster. (State Defs. R. 56.1 Stmt. ¶ 13; Kane Decl. ¶ 5.) According to witnesses, plaintiff told this employee: "No wonder your husband punched your eye out. You deserve it. I'm going to remind you that every day so you have nightmares." (State Defs. R. 56.1 Stmt. ¶ 13.) Apparently, this employee is in fact a victim of domestic abuse. (Kane Decl. ¶ 7.)

Upon learning of the event, Generoso requested that the witnesses write their recollections, and upon receiving them he drafted a report of the incident and gave it to Iarocci.[2] (State Defs. R. 56.1 Stmt. ¶ 14.) After reviewing the witnesses' written statements, Iarocci considered the incident very serious. (City Defs. R. 56.1 Stmt. ¶¶ 51-52.) Iarocci and Vincent Toomey ("Toomey"), labor counsel for the City, recommended to Generoso that disciplinary charges be brought against plaintiff.[3] (State Defs. R. 56.1 Stmt. ¶ 15.) Generoso agreed and signed the charges prepared by

---

[2] Estelle Levy, Coleman, Roberta Bongiorno and Carolyn Brown all prepared written statements concerning the incident. (City Defs. R. 56.1 Stmt. ¶¶ 46-49.)

[3] Plaintiff asserts that Generoso had no authority to prefer the charges since he was a State employee, and that Iarocci was the person who actually decided to commence them. (Pl. R. 56.1 Stmt. ¶¶ 54-56.)

Toomey on April 29, 2005 and executed a Personnel Action Form approving plaintiff's suspension from her duties on May 6, 2005.[4]  (*Id.*; City Defs. R. 56.1 Stmt. ¶¶ 54-55.)  Iarocci reviewed these charges only after they were signed by Generoso.  (City Defs. R. 56.1 Stmt. ¶ 56.)  According to plaintiff, on April 29 Iarocci and Generoso asked her to resign and stated that if she did not she would be suspended and would not be returning.  (Pl. R. 56.1 Stmt. ¶ 128.)  Plaintiff was presented with these charges on May 6, 2005, on which date she was suspended without pay.  (City Defs. R. 56.1 Stmt. ¶ 57.)  Her regular salary was reinstated after 30 days.  (*Id.* ¶ 59.)

Because she was a member of the CSEA, the disciplinary proceedings against plaintiff were governed by the collective bargaining agreement ("CBA").  (*Id.* ¶ 22.)  By letter dated June 8, 2005, and in accordance with the CBA, Generoso appointed a hearing officer in charge of the disciplinary proceedings.  (*Id.* ¶ 60.)  Hearing sessions for these charges were conducted on July 19, August 30, November 9 and December 22, 2005 and January 5 and 18, 2006.  (State Defs. R. 56.1 Stmt. ¶ 16.)  Kane and Coleman were among the witnesses that testified about the events they witnessed.  (*Id.* ¶ 18.)  On July 28, 2006, the Hearing Officer issued his report finding that the disciplinary charges

---

[4]  The charges preferred and addressed at the hearing included allegations that plaintiff: (1) was abusive and disrespectful in her personal attack towards a co-worker; (2) was heard by others when she personally attacked her co-worker and was disruptive in the workplace; (3) from January 1, 2004 through April 27, 2005 was abusive and disrespectful in her dealings with members of the public; (4) from January 1, 2004 through April 27, 2005 was verbally abusive and disrespectful to her co-workers; (5) engaged in two acts of insubordination; (6) from January 1, 2004 through April 28, 2005 conducted herself inappropriately when arguing with supervisors and other employees, treating members of the public in a rude and disrespectful manner and being uncooperative with supervisors and co-workers; and (7) made threatening and/or disruptive comments in the work place on or about July 9, 2004 while being counseled about her conduct made comments that she would harm herself and others.  (Loomba Aff., Ex. M at 2-3.)  As to all of the charges, the hearing officer determined that the City sustained its burden and found plaintiff guilty.  (*Id.* at 53-54.)

were sustained and terminating plaintiff's employment.[5]  (*Id*. ¶ 17.)

Plaintiff filed a petition in the Supreme Court, Westchester County, on October 12, 2006 seeking a ruling that the Hearing Officer's report was arbitrary and capricious.  (City Defs. R. 56.1 Stmt. ¶ 65.)  By decision dated July 17, 2007, the court granted the City's motion to dismiss on the grounds that plaintiff failed to exhaust her administrative remedies.[6]  (*Id*. ¶ 66.)  Plaintiff commenced this action on February 16, 2006.  She filed a Supplemental Complaint dated September 20, 2006.  Plaintiff alleges that as a result of her reporting concerns about the corruption at the City court—including the theft of over $3,000, the falsification of records, Generoso's receipt of gifts in exchange for dismissing tickets, criminal mischief in connection with the keying of an employee's car, the City Marshal's conduct, the illegal possession and sale of controlled substances, the unlawful retention of Generoso's aunt and Generoso's violation of the laws governing Civil Service—defendants entered into an agreement to terminate her employment and in that connection Generoso preferred the disciplinary charges.  (Suppl. Complt. ¶¶ 9-12.)  She also alleged that Kane, Coleman and Iarocci, among others, gave false testimony against her during the disciplinary hearings and that the appointed Hearing Officer was known to render determinations favorable to the local municipality.  (*Id*. ¶¶ 12-13.)

---

[5]  Under the CBA, the decision of the Hearing Officer is final and binding, and the arbitration provisions of the agreement apply in the event the employee wishes to appeal the decision.  (City Defs. R. 56.1 Stmt. ¶ 25.)

[6]  Plaintiff asserts that the Hearing Officer prohibited her counsel from submitting a defense and that the Officer had no authority to terminate her.  (Pl. R. 56.1 Stmt. ¶¶ 134-36.) Because plaintiff did not exhaust her administrative remedies regarding the hearing, we cannot and do not address these concerns here.

## I.      Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. *See* FED. R. CIV. P 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The burden is on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether to grant summary judgment, the Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

## II.      First Amendment Claim

"[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). To establish a violation of those rights, a government-employee plaintiff "must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision,[7] and (3) a causal connection exists between his speech and the adverse employment determination against him." *Hale v. Mann*, 219 F.3d 61, 70 (2d Cir. 2000) (internal quotation marks and citation omitted). To establish a causal connection, a plaintiff must demonstrate that the speech was a substantial or motivating factor in the adverse employment action. *See Burkybile v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 313 (2d Cir. 2005) (citing *Morris*

---

[7] Plaintiff has satisfied this second prong because she was suspended after disciplinary charges were brought against her and ultimately terminated in connection with those charges. *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).

*v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)).


A.     <u>Protected Speech</u>

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48 & n.7); *see Pappas v. Giuliani*, 290 F.3d 143 (2d Cir. 2002). Speech touches a matter of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. "In reaching this decision, the court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Lewis v. Cowen*, 165 F.3d 154, 163-64 (2d Cir. 1999). "The key inquiry is whether the statements were made by plaintiff in her role as a disgruntled employee or her role as a concerned citizen." *Woods v. Enlarged City Sch. Dist. of Newburgh*, 473 F. Supp. 2d 498, 530 (S.D.N.Y. 2007) (Conner, J.) (determining plaintiff's speech was not protected by the First Amendment because she made complaints in private regarding the performance evaluations that she received and the racial discrimination to which she was subjected; her speech was not designed to reveal District-wide racism, or address the impact of racism on the school environment).

According to plaintiff, at the April 5, 2004 meeting with Iarocci, in addition to her unhappiness about not receiving the promotion, she expressed concern that employees at the City court falsified documents and padded tickets, that Generoso received gifts for dismissing or reducing tickets, that Coleman stole approximately $3,500 and that the City Marshal was running a private law office from the City on City time. Plaintiff also states that she expressed similar concerns to

Idoni at their meeting in May 2004. During the July 9, 2004 meeting with plaintiff, Iarocci, Generoso, Kane and Hochberger, plaintiff stated that she was unhappy at the City court, complained that co-workers screamed at her and each other and claimed that Generoso was a liar and took the word of liars concerning her; and according to plaintiff, she also stated again her concerns that employees were padding tickets. In March 2005 plaintiff and her husband met with Berg, and plaintiff states that she communicated concerns to Berg similar to those she expressed to Iarocci and Idoni. On March 16, 2005 she was called to a meeting with Generoso, Kane, Berg, Leone, Judge Scher and Iarocci. The purpose of the meeting was to discuss the procedure for handling money shortages. Plaintiff states that she was directed to join the meeting just before it ended and that Generoso and Iarocci pressured her to resign and she expressed concern that defendants were lying about her. One other meeting was held before the charges were preferred, on April 18, 2005 between Iarocci, Martin, plaintiff, Hochberger and Caldararo. At this meeting plaintiff complained about her time sheet, that she was asked to provide a doctor's note and that City employees were tracking their time on forms created for State employees.

The fact that plaintiff spoke in private meetings does not by itself determine whether she addressed matters of public concern. *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 165 (2d Cir. 2006) (determining that plaintiff's letter addressing matters of public concern was not deprived of First Amendment protection because it was sent privately to defendants). The content, form and context of plaintiff's meetings with defendants make it clear that some of her speech did touch on matters of public concern. Plaintiff claims that beginning in April 2004 she told Iarocci about falsified documents, padding tickets, stolen government money and the City Marshal running a private law office on City time. She also expressed some of the same concerns to Mayor

11

Idoni in May 2004 and Berg in March 2005. She addressed her concerns about employees padding tickets again in her July 9, 2004 meeting with Iarocci, Generoso, Kane and Hochberger. Allegations of corruption and theft in the City court are matters of public concern. *See Johnson v. Ganim*, 342 F.3d 105, 113-14 (2d Cir. 2003) (finding that plaintiff's letter to defendant and administration officials accusing the administration of activities which were viewed by the plaintiff as involving corruption and crime touched on matters of public concern). It seems clear that plaintiff was motivated in part by a concern for the public good. She addressed these complaints to a number of different authorities and she discussed them as they related to the functioning of the City court.

Plaintiff's complaints about employees screaming at each other and about sick leave and time sheets are internal personal administrative matters rather than matters of public concern. Plaintiff spoke of these matters as they affected her and her own job satisfaction. Therefore to the extent that the April 2005 meeting discussed only these concerns we do not consider it here. Although during some of the other meetings plaintiff likewise addressed personal concerns, it does not affect our decision that plaintiff's speech touched on matters of public concern during those meetings. *See Johnson*, 342 F.3d at 114 (determining plaintiff's speech was protected even if he took a personal interest in the matter because "[m]ixed motivations are involved in most actions we perform every day; we will not hold [plaintiffs] to herculean standards of purity of thought and speech.") (internal quotation marks and citation omitted; alterations in original).

City defendants argue that plaintiff complained to Iarocci about not receiving a promotion and about unpleasant internal working conditions and therefore her speech is not protected by the First Amendment. (City Defs. Mem. Supp. Mot. Summ. J. at 15.) However, according to plaintiff, in her meetings with Iarocci in April and July 2004 she expressed her concerns about the alleged

corruption and theft at the City court.  Iarocci offers no evidence to the contrary except his recollection of the meeting which does not include any discussion of these matters.  (City Defs. Reply Mem. Supp. Mot. Summ. J. at 2-3.)  Iarocci testified that he did not recall everything said during the meeting with plaintiff.  (Nicaj Aff'm, Ex. 24 at 40.)  For this motion we must accept the well pleaded facts in the light most favorable to plaintiff, and she has sufficiently alleged that she complained to Iarocci about matters of public concern.[8]

City defendants also argue that plaintiff herself had tickets reduced and did not complain about any wrongdoing or corruption until she failed to receive her promotion.  (City Defs. Reply Mem. Supp. Mot. Summ. J. at 9.)  Therefore, they argue, plaintiff's speech was not made as a concerned citizen, but as an employee with personal interests.  (*Id*.)  Although plaintiff worked at the court since 1996 and first brought her complaints to Iarocci in 2004 after not receiving a promotion, she still spoke on matters of public interest and states that she was concerned about the operations in the City court.  Although she may have also been motivated at the time by personal reasons, this does not alter our conclusion that, taking the facts in the light most favorable to plaintiff, she spoke on matters of public concern to defendants in April and July 2004.  *See Johnson*, 342 F.3d at 114.

**B.**    **Causation**

"To establish causation, a plaintiff must show that the protected speech was a substantial

---

[8] Generoso also states that he was neither involved in nor knew of any concerns plaintiff expressed about City court corruption.  (Generoso Decl. ¶ 14.)  Because plaintiff testified that she complained of certain instances of corruption at the July 2004 meeting with Generoso present, there is an issue of fact as to Generoso's knowledge and we can not say, for purposes of this motion, that he was unaware of plaintiff's protected speech.

motivating factor in the adverse employment action." *Cioffi*, 444 F.3d at 167 (internal quotation marks and citation omitted). "In this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001) (internal quotation marks and citation omitted; alteration in original). There is no bright line beyond which a temporal relationship is too attenuated to establish a retaliatory motive for adverse employment action, but courts in this Circuit have found that lapses of time from 3 months to one year are too attenuated to establish a retaliatory motive. *See Burkybile*, 411 F.3d at 314 (determining plaintiff failed to establish third element of causal nexus because more than a year passed between the protected activity and the adverse employment action); *Cooper v. Morgenthau*, 2001 WL 868003, at *8 (S.D.N.Y. July 31, 2001) (lapse of three months and three weeks too great to establish a causal connection between the filing of plaintiff's complaint and her termination).

Plaintiff's protected speech to defendants—regarding alleged corruption and theft at the City court—occurred on April 5, 2004 and July 9, 2004. Her protected speech to Berg occurred in March 2005. Immediately thereafter, Berg requested a meeting with defendants which took place on March 16, 2005. Plaintiff was not present for most of the meeting on March 16, and is therefore unaware of all the matters discussed. Berg and defendants testified that the discussion at the meeting was about the procedures for handling shortages and overages in the registers. (*See* Nicaj Aff'm, Ex. 20 at 457-58, Ex. 21 at 148-50 & Ex. 25 at 24.)

The time lapse between plaintiff's protected speech to defendants and the filing of disciplinary charges against her was approximately 10 months, July 9, 2004 to April 29, 2005. This

is not the close temporal proximity necessary to establish causation. *See Diaz v. Weill Med. Ctr. of Cornell Univ.*, 2004 WL 285947, at *22 (S.D.N.Y. Feb. 13, 2004) (five and a half months was not the "very close" proximity sufficient to raise an inference of causality); *Taylor v. Potter*, 2004 WL 1811423, at *20 (S.D.N.Y. Aug. 16, 2004) (finding that eight-month gap was insufficient to establish a causal connection between plaintiff's EEO complaint and his seven-day suspension) (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)).

Plaintiff does not allege that she spoke out about corruption or theft at the meeting on March 16, 2005. However, it strains credulity to think that mere days after plaintiff went outside of the City court and complained to Berg about court corruption,[9] Berg held a meeting with defendants without mentioning any of those complaints. Charges of corruption and bribery are among the most serious accusations that can be made against a court, particularly when made to a higher authority responsible for overseeing the operations of the court. It is inconceivable that Berg would not even mention these charges to defendants during the March 16 meeting. If she did, the lapse of a little more than one month between that meeting and the preferment of disciplinary charges against plaintiff creates an inference of causation. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (finding causal connection where plaintiff's discharge came less than two months after she filed a complaint with management and just ten days after she filed a complaint with the New York Division of Human Rights); *Pergament v. Fed. Ex. Corp.*, 2007 WL 1016993, at *13 (E.D.N.Y. Mar. 30, 2007) (determining plaintiff satisfied her burden of showing indirect causation

---

[9] Berg is the district executive for the Ninth Judicial District, which oversees the operation of all courts within the District, including the New Rochelle City Court. This was the first time that plaintiff had taken her complaints and concerns outside the confines of the City court.

where she was terminated approximately two and a half months after filing her initial complaint of discrimination against her supervisor and less than a month after she filed her second).

Defendants argue that, in addition to the amount of time that passed between plaintiff's activities and the adverse action, plaintiff's incident in which she verbally abused another employee in front of witnesses, which occurred immediately prior to the filing of the disciplinary charges, is an intervening event that further supports the conclusion that there is no issue of fact as to causation. (*See* City Defs. Mem. Supp. Mot. Summ. J at 13-14.) While an intervening act may weaken the inference of a causal connection where the time between the protected activity and the adverse action is not close,[10] here the time between plaintiff's speech and the filing of the disciplinary charges was very close. Although the incident of plaintiff's verbal abuse occurred immediately before the disciplinary charges were filed, plaintiff has alleged sufficient facts to suggest that defendants were

---

[10] *See Dibble v. Fenimore*, 488 F. Supp. 2d 149, 158 (N.D.N.Y. 2006) (finding that, in addition to the long period of time between the protected activity and the alleged retaliatory act, there were intervening events of misconduct and insubordination that could suffice on their own to provide reasons for denial of re-enlistment); *Figuera v. Weisenfreund*, 2006 U.S. Dist. LEXIS 89031, *24 (E.D.N.Y. Dec. 8, 2006) (the passage of time after plaintiff spoke out until he was served with charges was more significant given that plaintiff's termination followed a series of complaints against plaintiff for his unsatisfactory job performance which demonstrated a nexus between plaintiff's unsatisfactory job performance and the adverse employment action); *Tasadfoy v. Ruggiero*, 365 F. Supp. 2d 542, 551 (S.D.N.Y. 2005) (determining inference of causation was defeated where time between protected speech and suspension was almost a year and because the charges preferred against plaintiff grew out of an admitted violation of the law and actions relating to the obliteration of documents from co-workers' computers); *Contes v. Porr*, 345 F. Supp. 2d 372, 383 (S.D.N.Y. 2004) (dismissing retaliation claim because 21 months passed between the protected political expression and the allegedly retaliatory act, and the alleged retaliatory act occurred immediately after plaintiffs' colleagues filed formal complaints of sexual harassment against them); *Lambert v. N.Y. State Office of Mental Health*, 2000 WL 574193, at *13 (E.D.N.Y. Apr. 24 2000) (determining that the temporal inference for causation was unavailable because there was a four-month lapse between plaintiff's protected activity and her transfer and there were developments between these dates that provided valid, non-discriminatory reasons for the adverse employment actions and that undermined the plausibility of the causal connection).

trying to get rid of her before preferring the charges, by pressuring her to resign, and that this incident was "merely an excuse" for them to do so. (Pl. Mem. Opp. Summ. J. at 10.) Plaintiff argues that the same employee she was accused of abusing had problems with other people in the City court, and at one point Coleman advised Generoso that if Generoso did not move this employee away from Coleman she would punch the employee. (*Id*.) Plaintiff argues that this employee herself was "verbally abusive" to plaintiff and other people, and Kane did not take any action against her. (*Id*.) Basically, plaintiff argues that defendants' stated reasons for filing the charges were a pretext for the real retaliatory motive.

Defendants reply that the incident in which Coleman told Generoso that she wanted to punch this employee and the incident in which plaintiff verbally attacked this employee are "not even remotely similar," and that plaintiff cannot establish that the decision to file disciplinary charges against her was motivated "by anything other than her blatant verbal/psychological attack on a co-worker." (City Defs. Reply Mem. Supp. Mot. Summ. J. at 10-11.) However, defendants motivation for filing charges against plaintiff "is exactly what is factually in dispute in this case, and hence cannot be decided at summary judgment." *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004) (rejecting defendants' contention that an intervening event precluded an inference of discrimination where two weeks after plaintiff complained his supervisors agreed to terminate him, and determining that the actual cause of the termination was therefore in dispute).

Plaintiff's burden is to raise a genuine issue of fact as to whether there was a causal link between her constitutionally protected speech and defendants' preferment of disciplinary charges against her. She has done so; therefore plaintiff's claim must survive summary judgment. The intervening event does not change this conclusion because plaintiff has introduced evidence that

raises an issue of fact as to defendants' actual motivation for filing the charges against her.

Plaintiff also argues that defendants' adverse actions began before May 2005. (Pl. Mem. Opp. Mot. Summ. J. at 8.) She argues that after she met with Iarocci in April 2004 her relationship with Generoso deteriorated; that employees were chastised for socializing with her; that, for example, employee Barbara Bartucca told plaintiff Generoso yelled at her when he learned she socialized with plaintiff; that court officers were permitted to harass her "by telling her she had beeped and had to go through a magnetometer" and when the supervisor told her he would not take any action against the officers for that. (*Id*.) Plaintiff argues that the "daily harassment" forced her to request a transfer in the July 2004 meeting with defendants. (*Id*. at 9.) Plaintiff relies on *Phillips v. Bowen*, 278 F.3d 103 (2d Cir. 2002), to support her argument that seemingly minor incidents may form the basis of a retaliation claim once they reach critical mass.

The Second Circuit, in *Phillips*, held that

> in order to prove a claim of First Amendment retaliation in a situation other than the classic examples of discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand, plaintiff must show that (1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace.

*Id*. at 109. Plaintiff alleges in her Supplemental Complaint that defendants retaliated against her by preferring disciplinary charges that resulted in her termination; she does not allege that defendants retaliated against her by creating a hostile working environment, nor that the total circumstances of her working environment changed to become unreasonably inferior and adverse. Aside from vague and conclusory allegations that her relationship with Generoso deteriorated and she was subjected

to daily harassment,[11] the only evidence of incidents she offers is the hearsay testimony that Generoso yelled at an employee for socializing with her and her allegations that the officers harassed her by telling her she needed to go through the magnetometer again.

"Incidents that are relatively minor and infrequent will not meet the standard, but otherwise minor incidents that occur often and over a longer period of time may be actionable if they attain the critical mass of unreasonable inferiority." *Id.* In our view, the incidents alleged here were both minor and infrequent; there is nothing alleged that resembles either concerted and continuous harassment or a single incident that is particularly severe. *See, e.g., id.*; *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000). Taken together these incidents do not create an objectively unreasonable and inferior working environment and no reasonable jury could find that they did. *See Deters v. Lafuente*, 368 F.3d 185, 188-89 (2d Cir. 2004) (holding plaintiff's hostile environment allegations were insufficient to raise a constitutional claim of retaliation where plaintiff had alleged that he was castigated for not doing his job, accused of failing to respond to calls, accused of playing games on the police radio, issued a summons for failing to remove ice from a home he owned, told by a police captain that he would never get selected for a specialized position, ordered to remain standing at a street corner for hours and instructed that fellow officers should not ride with him); *Maysonet*, 2005 WL 975897, at *10 (finding plaintiff failed to meet standard for hostile environment where she claimed her supervisor intimidated her in a meeting by strongly

---

[11] *See Maysonet v. Thompson*, 2005 WL 975897, at *5 (S.D.N.Y. Apr. 25, 2005) (determining plaintiff's arguments that she "was the victim of several remarks which she attributed to her national origin," and that she "was not given the same support, was unfairly criticized, was treated differently with respect to her military orders and was treated differently with respect to requiring a doctor's note" were generalized assertions not supported by any evidence on which a jury could find that any adverse treatment was attributable to her national origin) (internal quotation marks and citation omitted).

stating that all agents must follow instructions or face termination, she occasionally received inferior assignments, she had difficulty obtaining parking and she was denied a government credit card). Therefore, plaintiff has not raised a triable issue of fact as to whether her working environment constituted an adverse action on the part of defendants.

Because plaintiff has alleged a prima facie case for retaliation, we must consider whether the individual defendants were personally involved in the adverse employment action and whether they are entitled to qualified immunity.

### C.    Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (internal quotation marks and citation omitted).

> Personal involvement can be shown by "evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring."

*Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)) (alterations in original).

As to defendant Coleman, plaintiff offers no evidence to meet any of these criteria. The only criteria that could apply to her is that she directly participated in the constitutional violation. However, plaintiff offers no evidence to that effect. Plaintiff argues that in April 2004 Coleman

"falsely reported" plaintiff was going to use a gun to shoot people after plaintiff did not receive the promotion.  (Pl. Mem. Opp. Mot. Summ. J. at 12.)  However, whether or not this report was false, it is too attenuated from the adverse act to establish Coleman's participation in that act.  Plaintiff also argues that Coleman provided a "false written account" of the April 2005 incident of verbal abuse. (*Id*. at 13.)  However, even assuming the written statement was false, plaintiff offers no evidence that Coleman was motivated to take that action in retaliation for plaintiff's First Amendment protected activity, in fact plaintiff offers no evidence that Coleman was even aware of plaintiff's protected activity.  "Conclusory allegations cannot sustain a § 1983 claim, which requires specific facts under which a court could grant relief."  *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 355 (S.D.N.Y. 2000).

As to defendants Kane, Iarocci and Generoso, plaintiff offers sufficient evidence that they were aware of her protected speech; all three defendants were present at the March 16, 2005 meeting with Berg.  However, plaintiff offers no evidence that Kane participated in filing the disciplinary charges against her.  Plaintiff alleges that Generoso requested the written statements of the incident, Generoso provided Iarocci with those statements, Iarocci recommended disciplinary charges be filed and Generoso then signed the disciplinary charges.  Plaintiff has offered no evidence of Kane's direct involvement, however she has offered sufficient evidence of both Iarocci's and Geneoro's involvement.

Iarocci argues that he had no personal involvement in the alleged constitutional deprivations and is therefore not liable under § 1983.  (City Defs. Mem. Supp. Mot. Summ. J. at 8-9.)  He argues that at most, he recommended that Generoso consider disciplinary charges and testified at the disciplinary hearings.  However, plaintiff alleges that Iarocci had the authority to bring the charges because she was a City employee and Generoso declared that Iarocci informed him that disciplinary

charges were going to be "assemble[d]"against plaintiff. (Generoso Decl. ¶ 12.) Because there is

an issue of fact as to Iarocci's involvement, we can not conclude, as a matter of law, that he is not

liable under § 1983.


      **D.**     <u>**Conspiracy**</u>

      "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more

state actors or between a state actor and a private entity; (2) to act in concert to inflict an

unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."

*Pangburn v. Culberston*, 200 F.3d 65, 72 (2d Cir. 1999). Because "conspiracies are by their very

nature secretive operations," a plaintiff may support a claim with circumstantial, rather than direct,

evidence. *Id*. (internal quotation marks and citation omitted). However, "complaints containing only

conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive

the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are

insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. County of

Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (internal quotation marks and citation omitted). Plaintiff

has not offered evidence to create an issue of fact that defendants reached a meeting of the minds to

retaliate against her for her protected speech.

      "[P]laintiff must provide some factual basis supporting a meeting of the minds, such as that

defendants entered into an agreement, express or tacit, to achieve the unlawful end; plaintiff must

also provide some details of time and place and the alleged effects of the conspiracy." *Romer*, 119

F. Supp. 2d at 363 (internal quotation marks and citation omitted). In *Romer*, the plaintiff stated the

means by which the defendants communicated with one another and cited the defendants' acts in

furtherance of their alleged conspiracy, however, he suggested nothing to support an inference that any of the alleged communications were aimed at or led to a meeting of the minds among the defendants to deny the plaintiff a constitutional right. *Id.* at 364. The court determined that, "[a]bsent allegations of facts leading to a reasonable inference that defendants conspiratorially conferred with a purpose of actually depriving [plaintiff] of any recognized constitutional right, he cannot state a sustainable conspiracy claim." *Id.*; *see Hickey-McAllister v. British Airways*, 978 F. Supp. 133, 139 (E.D.N.Y. 1997) (determining that the plaintiff alleged no facts to infer a meeting of the minds between the defendants to deprive the plaintiff of her constitutional rights; although the plaintiff alleged that the defendants testified falsely against her, she then made only vague and conclusory allegations that they did so in furtherance of a conspiracy).

Although we determined that plaintiff provided enough evidence to establish an inference of causation for her retaliation claim, she has not provided sufficient evidence to establish that defendants reached an agreement to conspire against her, and therefore her conspiracy claim fails. The only mention of conspiracy in the entire Supplemental Complaint is found in paragraph 11, which alleges that as a result of plaintiff's expression of her concerns regarding court corruption, "[d]efendants in or about April 29, 2005, entered into an agreement to punitively terminate her employment with a view towards silencing her and exacting retribution." (Suppl. Complt. ¶ 11.) She goes on to allege that in furtherance of that agreement, Generoso preferred disciplinary charges against her and Kane, Coleman and Iarocci testified falsely against her at the disciplinary hearing. (*Id.* ¶¶ 12-13.) However, plaintiff has offered no evidence from which a reasonable juror could conclude that defendants reached an agreement to cooperate in retaliating against her for her protected speech, which is a necessary element of a conspiracy claim. *See Ciambriello*, 292 F.3d

at 325; *Romer*, 119 F. Supp. 2d at 364.

Summary judgment is granted as to the retaliation claim against Kane and Coleman because plaintiff has not offered any evidence to establish their direct participation in the preferment of disciplinary charges against her or their participation in a conspiracy to deprive her of her constitutional rights. Summary judgment is denied as to the retaliation claim against Generoso and Iarocci because, although plaintiff has failed to allege any facts that support a conspiracy among them, she has sufficiently alleged their direct participation in the preferment of disciplinary charges against her.

III.     **Equal Protection Claim**

Plaintiff claims that defendants' suspension of her pay and their prosecution of her on the subject disciplinary charges comprises a selective enforcement that violates her right to Equal Protection. "The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "To succeed in an action alleging selective prosecution, plaintiffs in this Circuit

> have been required to show both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (quoting *Harlen Assocs.*, 273 F.3d at 499). Although plaintiff alleges that she was treated differently from similarly situated employees, and in her memorandum she explains how she was treated differently, she does not allege that the differential

treatment was based on the intent to punish her for the exercise of her First Amendment rights. Because plaintiff brings the First and Fourteenth Amendment claims together, and makes no other allegations, we will assume that this is the basis for her Equal Protection claim. *See African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 363 (2d Cir. 2002) (plaintiffs alleged an Equal Protection claim asserting defendants' act was impermissible under the First Amendment, therefore "plaintiffs' factual allegations throughout the case require the conclusion that their [E]qual [P]rotection claim and their First Amendment claim coalesce"). Therefore, plaintiff has satisfied the second prong of the test because she has raised an issue of fact as to whether the disciplinary charges were based on an intent to punish her for the exercise of her right to free speech.

As for the first prong, which requires that the persons be "similarly situated," the individuals with whom plaintiff attempts to compare herself "must be similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). What constitutes "all material respects" varies somewhat from case to case and "must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). To satisfy the similarly situated standard, "a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards." *Id*. The standard for comparing conduct requires "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's" acts and "an examination of the context and surrounding circumstances in which those acts are evaluated." *Id*.

Plaintiff compares herself to the following employees: Mary Perone, an employee of the City working in the Clerk's office; Jamie Swanson ("Swanson"), a City employee of the Clerk's office;

Estelle Levy ("Levy"), an employee in the Clerk's office; Kane, employed by the State as the Deputy Chief Clerk; Barbara Bongiorni ("Bongiorni"), a staff member in the Clerk's office; Coleman, employed by the State as the judges' secretary; Sam Pierce ("Pierce"), the City Marshal; March Brogdon ("Brogdon"), a "court staff member" and Michael Serrano ("Serrano"), a court officer. (Pl. Mem. Opp. Mot. Summ. J at 14-17.) We first determine whether any of these employees were subject to the same workplace standard as plaintiff, and if so whether their conduct was of comparable seriousness.

Plaintiff offers no evidence from which we can determine whether plaintiff and these employees were subject to the same workplace standards, the same performance evaluation or discipline standards. Because we find that the conduct of other employees in the Clerk's office, including Perone, Swanson, Kane, Bongiorni and Levy, are not of comparable seriousness to plaintiff's conduct, we will assume that employees of the Clerk's office are subject to the same workplace standards for this motion. We can not make that assumption as to other City court employees, and because plaintiff has offered no evidence that would suggest these employees are subject to the same standards, we determine that plaintiff is not similarly situated to Coleman, Pierce, Brogdon and Serrano. The cursory and limited descriptions of these employees' jobs in the City court that plaintiff provides is not enough for a reasonable juror to conclude that they were situated similarly to plaintiff; and we can not assume that a clerk, such as plaintiff, is situated similarly to a court officer, a City Marshal, a judges' secretary or a court staff member.

Plaintiff alleges that Perone has repeatedly and loudly used the epithet "nigger" in the workplace and defendants knew about it but did not discipline her. (Pl. R. 56.1 Stmt. ¶ 81.) While this behavior is disrespectful and offensive, and we strongly condemn it, plaintiff does not allege that

Perone used this word in the context of a verbal attack on another employee or member of the public. Plaintiff verbally attacked her co-worker on a very personal and traumatic issue in the presence of multiple witnesses and we do not find Perone's conduct of seriousness comparable to plaintiff's targeted personal attack against a co-worker.[12] Plaintiff has not alleged that Perone engaged in particular acts of racism against co-workers or the public, despite the general use of this very offensive term, and without more we do not think a reasonable juror could conclude that plaintiff's and Perone's conduct were of comparable seriousness.

Plaintiff alleges that Coleman learned that Swanson referred to a customer at the Clerk's window as a bitch. (*Id*. ¶ 82.) Plaintiff offers no further evidence of this incident nor does she allege how she found out about the incident. Without further facts we cannot conclude that this incident was of comparable seriousness nor do we even know whether Swanson was disciplined for the alleged conduct. Plaintiff also alleges that Swanson pads tickets in exchange for kickbacks from customers. (Pl. Mem. Opp. Summ. J. at 17.) However, plaintiff offers no facts as to any specific incidents of such padding. Such conclusory allegations can not withstand this motion. *See Patterson v. County of Oneida*, 375 F.3d 206, 227-28 (2d Cir. 2004) (holding that conclusory and unsupported assertions by plaintiff are insufficient to withstand a motion for summary judgment on a section 1983 claim).

Plaintiff alleges that Kane and Bongiorni cursed in the workplace, particularly using the phrase "Fuck me." (Pl. R. 56.1 Stmt. ¶ 79.) While we agree with plaintiff that this language is coarse and unprofessional, plaintiff does not allege that either Kane or Bongiorni used this language

---

[12] In fact, the New York State Department of Labor's proposed regulations on The Public Employee Workplace Violence Prevention Program include "verbal abuse" in the definition of "workplace violence." (Loomba Reply Aff., Ex. W at 7.)

in a personal attack against a co-worker or the public; she simply alleges that they used such language in the workplace. Without more, we do not think a reasonable juror could find this conduct comparable in seriousness to plaintiff's vicious verbal attack on another employee who was suffering serious domestic problems. Plaintiff also alleges that Kane engages in "felony sales of controlled substances . . . to her co-workers." (Pl. Mem. Opp. Mot. Summ. J at 16.) However, Kane admitted to providing Vicodin to co-workers who had their own prescriptions but who had run out of medication; she did not sell controlled substances. (Pl. R. 56.1 Stmt. ¶ 133; Nicaj Aff'm, Ex. 30 at 9-10.) Therefore, we do not find this conduct of seriousness comparable to plaintiff's verbal attack against a co-worker.

Plaintiff alleges that Levy engaged in rude and abusive behavior toward her and she complained to Kane about it. (Pl. R. 56.1 Stmt. ¶¶ 125-26.) Plaintiff offers no further facts about the particular incident of abuse, the context or the circumstances, and therefore has not offered enough for a reasonable juror to find the incidents of comparable severity.

Plaintiff additionally alleges that City court employees, at the direction of Kane and Generoso, delete parking totals to conceal the amount of money lost each day by illegal dismissal and reduction of tickets. (Pl. Mem. Opp. Mot. Summ. J at 17.) However, plaintiff offers no particular employees or particular incidents and therefore these conclusory allegations are not enough to withstand this motion.

## IV.    <u>Absolute Immunity</u>

"Under the law in this Circuit, a municipal official is entitled to absolute immunity for his decision to initiate administrative disciplinary proceedings against an employee." *Magilton v. Tocco*,

379 F. Supp. 2d 495, 503 (S.D.N.Y. 2005) (citing *Spear v. Town of W. Hartford*, 954 F.2d 63, 66

(2d Cir.1992)). Where absolute immunity applies, "no action for damages lies—even if the official

acted for a base motive that would otherwise subject him to suit." *Id*. (citing *Contes*, 345 F. Supp.

2d at 379). In *Magilton*, the court determined that the Commissioner of the Department of Public

Works was entitled to absolute immunity for his decision to file  disciplinary charges against the

plaintiff under Section 75 of the Civil Service Law, even though the plaintiff alleged that the charges

were brought in retaliation for his reports of health and safety violations to his union.  *Id*.

Defendant Iarocci argues that he is entitled to absolute immunity from any claim based on

his participation in the initiation of disciplinary charges against plaintiff.[13]  (City Defs. Mem. Supp.

Mot. Summ. J. at 7.)  Because the disciplinary charges against plaintiff were brought pursuant to

Article XII of the CBA, which applies to all employees covered by Section 75 and 76 of the Civil

Service Law in lieu of the procedure specified in those sections, the official who initiated the

disciplinary proceedings would be entitled to absolute immunity.  (*See* Loomba Aff., Exs. A & J.)

However, we must keep in mind that "because [absolute immunity] detracts from section 1983's

broadly remedial purpose . . . [it] applies only to a limited class of officials and functions." *Spear*,

954 F.2d at 66 (internal citation omitted).

On the record before us, Iarocci did not file the charges against plaintiff.  As Iarocci stated,

he believed that the incident was serious and that charges should be brought, but he made that

recommendation to Generoso and it was Generoso who provided the information to Toomey to draw

---

[13]  Defendant Iarocci also argues that he is entitled to absolute immunity from any
allegation that he falsely testified against plaintiff.  (City Defs. Mem. Supp. Mot. Summ. J. at 7.)
We need not address this, however, because plaintiff states she does not base her claim on his
testimony at the disciplinary proceedings.  (Pl. Mem. Opp. Summ. J. at 24-25 n.5.)

up the charges and it was Generoso who signed the actual charges. (City Defs. R. 56.1 Stmt. ¶¶ 52-55.) Iarocci did not participate in the drafting of the disciplinary charges, nor did he review them before they were signed by Generoso. (*Id*. ¶ 56.) Because it is the filing of the charges that constitutes the adverse action here, and in fact plaintiff's Supplemental Complaint alleges that Generoso preferred the charges, Iarocci is not entitled to absolute immunity.

## V.     **Qualified Immunity**

The qualified immunity privilege ensures that "government officials performing discretionary functions [] are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1992); *see Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991). The privilege is "'an *immunity from suit* rather than a mere defense to liability; and . . . is effectively lost if a case is erroneously permitted to go to trial.'" *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original)). "As a result, '[the Court has] repeatedly [] stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Id*. at 201 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

The initial inquiry for a qualified immunity issue is whether the facts alleged show the government actor's conduct violated a constitutional right. *Id*. If a violation could be made out, the next step is to ask whether the right was clearly established, in the specific context of the case. *Id*. The Second Circuit has established three factors to determine whether a particular right was clearly established at the time defendants acted: "(1) whether the right in question was defined with

'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Jermosen*, 945 F.2d at 550. If the law clearly established that the conduct violated a constitutional right, qualified immunity is inappropriate. If, however, the law at the time was not clearly established, an official could not reasonably be expected to understand that the law forbade the conduct. *See Caldarola v. Calabrese*, 298 F.3d 156, 160-61 (2d Cir. 2002).

Defendants Iarocci and Generoso argue that they are entitled to qualified immunity.[14] (City Defs. Mem. Supp. Mot. Summ. J. at 17-19; State Defs. Mem. Supp. Mot. Summ. J. at 7-9.) Because we conclude that a violation of First Amendment rights could be made out, we consider whether that right was clearly established in the context of this case.

It is well settled by the Supreme Court and the Second Circuit that public employees may not be dismissed for the exercise of their First Amendment rights; this includes the right to speak on matters of public concern. *See Pickering*, 391 U.S. at 568; *Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir. 1995). It is also well settled that allegations of corruption and theft in a government workplace are matters of public concern. *See Johnson*, 342 F.3d at 113-14; *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 46 (2d Cir.1983). In light of the well-settled law at the time of the events of this case, it is reasonably expected that defendants understood the unlawfulness of filing disciplinary charges against a public employee as a result of speech on such matters. *See DePace v. Flaherty*, 183 F. Supp. 2d 633, 641 (S.D.N.Y. 2002).

---

[14] Defendant Kane also argued that she was entitled to qualified immunity but because we have granted summary judgment as to the claims against her we need not consider this argument.

"Even where an action is found to have been a violation of a clearly established right or rights, qualified immunity still applies if it was objectively reasonable for defendant to believe that his acts did not violate those rights in that officers of reasonable competence could disagree on their legality." *Romer*, 119 F. Supp. 2d at 355(internal quotation marks and citation omitted). Iarocci and Generoso would be entitled to qualified immunity if it was objectively reasonable for them to believe their actions did not violate plaintiff's rights.

In this case it was objectively reasonable, as defendants argue, for them to file disciplinary charges against plaintiff for her verbal attack on a co-worker. (*See* City Defs. Mem. Supp. Mot. Summ. J. at 18-19; State Defs. Mem. Supp. Mot. Summ. J. at 8-9.) However, plaintiff alleges that defendants had an unconstitutional subjective intent when they filed the charges: retaliation for her protected speech. "Upon a motion for summary judgment asserting a qualified immunity defense in an action in which an official's conduct is objectively reasonable but an unconstitutional subjective intent is alleged, the plaintiff must proffer particularized evidence of direct or circumstantial facts . . . supporting the claim of an improper motive in order to avoid summary judgment." *Sheppard v. Beerman*, 94 F.3d 823, 828 (2d Cir. 1996) (internal quotation marks and citation omitted; alteration in original).

City defendants argue that plaintiff can point to no more than a mere chronology of events following which disciplinary charges were filed against her; therefore she has not submitted particularized evidence of an improper motive. (City Defs. Reply Mem. Supp. Mot. Summ. J. at 10.) However, plaintiff does offer enough evidence to support her claim of improper motive. In our discussion of causation, we have already noted that plaintiff's evidence of retaliatory intent is sufficient to make defendants' motivation for filing the disciplinary charges a triable issue of fact.

*See Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). Because it would be objectively unreasonable for Iarocci and Generoso to believe that it was permissible to retaliate against an employee for exercising her First Amendment rights, qualified immunity is not available to them. *See DePace*, 183 F. Supp. 2d at 641-42.


## VI.    <u>Municipal Liability</u>

A government entity is responsible under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," but not under a theory of respondeat superior. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691, 694 (1978). In order for municipal liability to attach, the decision-maker must possess final authority to establish municipal policy with respect to the action ordered. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Mandell*, 316 F.3d at 385. "In a case involving retaliatory discharge, city officials not authorized to make employment policy lack final authority to provide a basis for municipal liability." *Cooper v. Metro. Transp. Auth.*, 2006 WL 1975936, at *2 (S.D.N.Y. July 14, 2006) (citing *Praprotnik*, 485 U.S. at 128).

As Personnel Director for the City, Iarocci had the power and was required to prepare a pay plan, establish training and educational programs, investigate and advise on working conditions, maintain liaison with the Municipal Civil Service Commission as to application of the Civil Service Law, establish a program to attract qualified persons for employment, review job descriptions and note any changes in the duties of the positions, receive complaints and grievances from employees regarding working conditions and perform other duties regarding personnel matters as the City

Manager directed.  (Nicaj Aff'm, Ex. 5 at 28.)  This job description does not include the specific authority to file disciplinary charges against City employees.  However, because the powers of Iarocci's position gave him authority to make employment policies for the City, there is at least a question of material fact as to whether Iarocci had the final authority to establish municipal policy with respect to disciplinary charges filed against employees.  Additionally, plaintiff has offered other evidence to suggest that the City had authority over any employment decisions regarding City employees.  Plaintiff offered the deposition testimony of Berg, in which Berg stated that any employment decisions regarding City employees in the court "were really up to the City."  (*Id*., Ex. 25 at 11.)

It is plausible that Iarocci did not have final policymaking authority with respect to determinations and decisions regarding disciplinary charges, in which case the City would not be liable for his involvement in filing the charges against plaintiff.  City defendants argue that Iarocci did not have the power to appoint, discipline or terminate all City employees, and that plaintiff in particular was appointed by Generoso and Generoso had the power to appoint, supervise and discipline plaintiff.  (City Defs. Reply Mem. Supp. Mot. Summ. J. at 14.)  Iarocci testified that he had no authority and he did not sign or file the disciplinary charges against plaintiff, Generoso did.  However, on the record before us, there is a genuine issue of material fact related to this issue.  *See Magilton*, 379 F. Supp. 2d at 505-06; *Rucci v. Thoubboron*, 68 F. Supp. 2d 311, 326 (S.D.N.Y. 1999) (Conner, J.).  Therefore, summary judgment as to the City is denied.


**CONCLUSION**

For all of the foregoing reasons, defendants' motion for summary judgment is granted in part

and denied in part.[15]  Summary judgment is granted as to defendants Barbara Coleman and Victoria L. Kane.  Summary judgment is also granted as to plaintiff's Equal Protection claim.  Summary judgment for defendants James Generoso, Matthew Iarocci and the City of New Rochelle is denied as to plaintiff's First Amendment retaliation claim.

SO ORDERED.

Dated:  White Plains, New York
      July 18, 2008

_____
Sr. United States District Judge

---

[15]  State defendants argue that plaintiff fails to state a Due Process claim and her claims for money damages are barred by the Eleventh Amendment.  (State Defs. Mem. Supp. Mot. Summ. J. at 9-10.)  Plaintiff has not stated a Due Process claim therefore we need not address the first argument.  We need not address the second argument either because plaintiff brought suit against the State defendants in their individual, not official, capacities.